# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4932 | **DATE** | 4/26/2002 |
| **CASE TITLE** | Durkin vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment on all counts is granted and the case is terminated. Any pending motion in this case is terminated as moot. Any schedule set in this case is also vacated. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | **2** number of notices | **Document Number** |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | APR 2 9 2002 date docketed | 61 |
| | Docketing to mail notices. | 15 docketing deputy initials | |
| ✓ | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 4/26/2002 date mailed notice | |
| MPJ | courtroom deputy's initials | MPJ mailing deputy initials | |

Date/time received in central Clerk's Office

DOCKETED

APR 2 9 2002

| | |
|---|---|
| KATHY DURKIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 00 C 4932 |
| | ) |
| CITY OF CHICAGO, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Kathy Durkin sues the City of Chicago for equal protection violations under 42 U.S.C. § 1983, as well as sexual harassment, discrimination, and retaliation under Title VII, 42 U.S.C. 2000e *et seq.* The City moves for summary judgment, which I grant.

I.

In 1999, Kathy Durkin entered the Chicago Police Academy ("the Academy") as a probationary police officer ("PPO"). She was a successful recruit in all areas of her training except for firearms training. Chicago Police Department ("CPD") recruits were required to pass a "Mandatory Firearms Training for Peace Officers," prescribed by the Illinois Police Training Act, with a score of 70 percent or above. Although there was no written policy limiting the number of attempts, Assistant Deputy Superintendent Charles Roberts, who ran the Academy, had established and enforced a policy of allowing recruits only four attempts to qualify, and Durkin signed an acknowledgment that she would receive only four attempts to qualify.

61

Durkin had an acrimonious relationship with two of her firearms instructors. Officer Nick Pappas swore at her and yelled obscenities at her, and before her first attempt to qualify, Pappas kicked Durkin to correct her stance while she was holding a loaded gun. Durkin admits that she had difficulty with shooting, but she says it is because she received inadequate instruction and because she was harassed. For example, the first time she fired a shotgun, her instructor refused to tell her how to hold it, so she was knocked over and badly bruised because she held the weapon incorrectly.

After her third failure, Durkin was assigned to twenty hours of one-on-one remedial training with Officer James Peck. During her training, Peck refused to give any verbal instruction to Durkin, and often made her stand, sometimes for as along as forty minutes, in a two-by-two foot square taped on the floor at the shooting range office. Although the box was a training tool, where recruits were supposed to stand and wait for recognition by a superior officer, Durkin says that Peck used it as a "bad girl" box and made her stand there as punishment, and would yell "Did you move, Durkin? Did you fucking move?"

Peck swore frequently at Durkin, who testified that she was unaccustomed to coarse language. Peck referred to women as "broads," "fucking broads," and "cunts" in her presence, and asked her once "who did you fuck to get that [college] degree?" He told

her she had a tiny brain, and when she finally shot a passing score in a practice round, he said that he "could teach a fucking monkey to shoot." When Durkin told her husband, Patrick Durkin, who was also a CPD officer, that she was unhappy with the scheduling of her training, he dropped by the firing range to talk to Peck. Peck said to him, "You have a real blond on your hands. Is she that stupid at home?" At their next training session, Peck told Durkin that she had "pulled out her witch bag" and said "so I hear you told your husband that you're not going to fuck him unless he came down here and talked to me." After her father died, Peck said that "his fucking father died too, get over it" and told her to "move on."

Unfortunately, the unpleasantries did not end on the firing range. During driving training, one of her classmates, PPO Dolan, exposed his penis to her while urinating, and said "suck this." The next day, she reported the incident to a female sergeant, and told Dolan that she had reported him. A few days later, Dolan said, in front of their CPR class, that he wanted to have sex with her. That same day, PPO Lopez, her class group leader, who had some supervisory responsibility, announced to their class that Durkin had sex with her husband over her lunch break. Lopez also said that he wanted to "fuck her" [Durkin] and "lick her all over." Also on the same day, other classmates commented, in front of peers and supervisors, that Durkin looked pregnant, and might as well leave the academy.

Durkin said that she "complained to virtually anyone who would listen," including her classmates, her homeroom instructor, Lieutenant Samuel Christian, Assistant Deputy Superintendent Roberts, and Deputy Superintendent Jeanne Clark. Her husband wrote a letter to Superintendent of Police Terry Hillard. Most of her complaints, however, dealt with general harassment and poor teaching methods.

When Durkin made her fourth attempt to pass the firearms qualification, on September 7, 1999, she requested permission from Lt. Christian, the Commanding Officer for Recruit Training, to fire a practice round. Lt. Christian denied the request for a practice round, and Durkin shot a passing score of 72 percent. Christian then told her that it was only a practice round and did not count. He made her shoot again to qualify. She only scored 66 percent, so she failed to qualify on her fourth try. She testified that, before she shot the first round, she and Christian argued back and forth about whether she was going to have a practice round.

Assistant Deputy Superintendent Roberts recommended terminating Durkin for failure to qualify in four attempts. On September 9, 1999, Durkin met with Deputy Superintendent Clark, and she complained about her training with Peck. She also told Clark about two of Peck's more egregious comments, and Clark filed a complaint register, which was forwarded to the Internal Affairs Division of the CPD. Instead of firing Durkin, Clark offered her

forty more hours of off-site training in Mattoon, Illinois, and told her that if she passed in Mattoon, she would be "done." She passed twice in Mattoon, and received a State of Illinois certificate of completion for forty hours of firearms training, but Lt. Christian refused to accept the scores and made her retake the test, with no advance notice, at the Academy in Chicago. When she took the test again, she failed, and was ultimately discharged. She sues the City for sexual harassment, discrimination, and retaliation under Title VII and for equal protection violations under 42 U.S.C. § 1983.

## II.

Summary judgment is proper when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001).

III. Section 1983 Municipal Liability

There is no *respondeat superior* liability for municipalities under § 1983, so to establish municipal liability, a plaintiff must show that her constitutional injury was caused "by (1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001). Durkin does not argue that there was an express policy, but she argues that there is evidence of a widespread practice of discrimination against women, and that three of her superiors at the Academy who harassed and discriminated against her were final policymakers.

Whether a person has final policymaking authority for the purposes of § 1983 is a question of state or local law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988); *Kujawski v. Board of Commissioners of Bartholomew County*, 183 F.3d 734, 737 (7th Cir. 1999). It is not enough to have and exercise authority, even if it is final; the question is whether a person has final authority to set policy. *Id.* at 739. *See also Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995) ("The discretion to make final decisions to carry out the policies of a local law enforcement entity does not equate to policymaking authority."). Durkin argues that Officers Pappas and Peck, and Lt. Christian were policymakers because they

6

controlled her performance in the workplace or determined whether she passed or failed. However, the Seventh Circuit has held that, as a matter of state and local law, CPD superior officers and supervisors are not policymakers for purpose of officer discipline, *see Latuszkin*, 250 F.3d at 505 (citing *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992) (CPD Superintendent of Police not final policymaking authority for purpose of employment policy)). Pappas, Peck and Christian are not people with policymaking authority.

To demonstrate that her injuries were caused by a widespread practice or custom of sexual harassment and discrimination, Durkin must show that there was "some knowledge or awareness--actual or imputed--of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation." *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986). "The longstanding or widespread nature of a particular practice would support the inference that policymaking officials 'must have known about it but failed to stop it.'" *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993).

There is no direct evidence of knowledge or acquiescence here. Durkin testified that she told anyone who would listen, including her fellow trainees and instructors, about the problems she was having with Pappas and Peck, and about an incident in which a male officer exposed himself and urinated in front of her. However,

neither her classmates nor her supervisors are "policymaking officials" who can, by their acquiescence, establish a City custom. *See Latuszkin*, 250 F.3d at 505. Her husband wrote a six-page letter to Superintendent Terry Hillard, chronicling the troubles that Durkin had with her firearms training, particularly with Officer Peck. The letter does not actually mention sexual harassment or discrimination, or even suggest that Durkin was treated unfairly because she was a woman. Mr. Durkin's own theory was that his wife was being punished for complaining about the kick she had received from Officer Pappas. Pl. Ex. O at 4.

Most of Durkin's evidence[1] of a "widespread practice" relates to the mistreatment that she suffered at the hands of Peck and Pappas. *See, e.g.*, Pl. Resp. to Def. 56.1 Stmt. ¶¶ 56-64, 69-87. However, she admits that she never saw how Peck acted with other recruits in one-on-one training sessions. Pl. Ex. A at 609. She also admits that she never saw Pappas kick another recruit, and the evidence indicates that Pappas was verbally abusive with "everybody," not just women. Pl. Ex. E at 125. And although there is evidence that Peck generally "had it in for women" and "would pick on women simply because his wife left him," Pl. Ex. E at 228,

---

[1] Most of this evidence, as well as the evidence of harassment by her classmates, is disputed by the City, but I draw all reasonable inferences in favor of Durkin on the City's motion for summary judgment, *see Markel v. Board of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002), and I assume for the purposes of this motion that she could prove that events unfolded as she describes them.

one officer with a grudge against women does not constitute a "widespread practice" of harassment or discrimination, particularly where there is no evidence that any policymaking authorities were aware of his tendencies. *See Jones*, 787 F.2d at 204.

Durkin also points to the actions of her classmates, but she admits that she never heard anyone else subjected to the same kind of verbal harassment, Pl. Ex. A at 292, or heard that anyone else had ever exposed himself to another recruit, *id.* at 285, 287. Durkin offers no evidence from which a jury could conclude that policymaking officials knew about this behavior and acquiesced in it, *see Jones*, 787 F.2d at 204, or that these incidents, which happened over the course of a few days, were "longstanding or widespread." *See McNabola*, 10 F.3d at 511. Durkin cannot establish that her constitutional injuries, if any, were caused by a municipal policy, so the City cannot be liable under § 1983.

## IV. Sex Discrimination

Because Durkin does not come forward with any direct evidence of sex discrimination here, she must proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires her to "demonstrat[e] that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly-situated male employees." *Patterson v. Avery Dennison*

9

*Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). If she establishes a *prima facie* case, the City must provide a legitimate, non-discriminatory reason for her termination, which shifts the burden back to her to demonstrate that the offered reason is pretextual. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 919 (7th Cir. 2001).

Durkin argues that other male recruits were treated more favorably because they were not subjected to harassment, but this does no more than repeat her harassment claim, which I address separately below. She argues that she ought to be "afforded a fair opportunity to show that the City's reason was in fact pretextual." Pl. Resp. at 15. However, first she must make out a *prima facie* case.

Durkin stumbles on the absence of evidence that similarly situated male employees were treated more favorably than she was. "To meet her burden of demonstrating that another employee is 'similarly situated,' a plaintiff must show that there is someone who is directly comparable to her in all material respects." *Patterson*, 281 F.3d at 680. The City submits an affidavit of Lt. Christian, who was in charge of recruit training, in which he states that the CPD has fired other recruits for failure to pass the firearm test after four attempts. In 1995, the CPD discharged two male and two female recruits; it discharged one male and two female recruits in 1996, no recruits in 1997 or 1998, and two male

recruits in 1999.[2] Durkin was also discharged in 1999. The City's evidence demonstrates that termination for failure to pass the firearm qualification was even-handed; in five years, it discharged five male recruits and five female recruits, including Durkin.

Durkin argues that none of the male recruits who failed were in her recruit class, and that they are therefore not similarly situated, but she offers no reason to define the relevant group of similarly situated recruits so narrowly. In any event, if I exclude this evidence, then there is no evidence whatsoever of similarly situated male recruits, and Durkin cannot establish a prima facie case. *See Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir. 1998) (plaintiff failed to make out prima facie case where "record is silent regarding whether there were other similarly situated" employees outside the protected class who were treated more favorably).

Thus I consider the evidence offered by the City. To determine whether the other nine recruits are "similarly situated," I consider "whether the employees 'dealt with the same supervisor' and were 'subject to the same standards' . . . . and whether the

---

[2] Durkin objects that she was "sandbagged" with this evidence because it was not provided in discovery. Pl. Resp. at 12. The existence of other recruits who were terminated for failure to pass the firearms qualification is not the type of evidence subject to automatic disclosure under Fed. R. Civ. P. 26(a). Durkin says that this material was not disclosed in depositions or in response to discovery requests, Pl. Resp. to Def's 56.1 Stmt. ¶ 11, but she does not identify the discovery that called for this information, so I will not exclude it on this motion.

employees had comparable 'experience, education and qualifications,' provided that the employer took these factors into account when making the personnel decision in question.'" *Patterson*, 281 F.3d at 680. So far as is shown by the record, by virtue of their status as recruits, all of other nine recruits shared the same experience and qualifications, and were subject to the same standards: does not point to any evidence that the firearm qualification standards changed over the five-year span. The evidence does not show whether the other nine recruits were instructed by Pappas and Peck, but it is Durkin's burden to furnish that information here, not the City's. Merely pointing out what the City's evidence does *not* show falls short of Durkin's burden to come forward with evidence on which a jury could find for her. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). There is no evidence that the other nine recruits were not similarly situated, and because all of them were terminated, they were not treated more favorably.

Durkin might have argued that the other nine recruits who failed in four attempts, and every other recruit who passed, were treated more favorably because she was cheated out of a passing score in her fourth attempt and they were not. A jury might reasonably believe that the first round that Durkin shot for Lt. Christian on September 7, 1999, was a qualification round rather than a practice round, and that she really did pass. However, this

shows only that she was treated less favorably and that she is a woman. There could be any number of reasons why Durkin was treated differently--for example, merely out of personal spite--but to make out a case of discrimination, she must at least raise an inference that she was treated less favorably *because* she is a woman. In the absence of other circumstantial evidence of discrimination, she must show this by pointing to similarly situated male recruits who were treated more favorably, and she cannot meet her burden by pointing to an absence of *any* similarly situated male recruits. *Johnson v. City of Ft. Wayne*, 91 F.3d 922, 935 (7th Cir. 1996) (holding that the plaintiff's evidence that no-one else had been treated the way he had been was "insufficient to demonstrate that any similarly situated [employee outside the protected class] was treated more favorably").

## V. Retaliation

Title VII "prohibits employers from discriminating against an employee 'because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 610 (7th Cir. 2001) (quoting 42 U.S.C. § 2000e-3(a)). As with discrimination, a plaintiff claiming retaliation may defeat summary judgment in one of two ways. The first method is to "present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that [s]he engaged in

13

protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which [s]he complains." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Direct evidence is "evidence that the trier of fact can interpret as an acknowledgment of the employer's discriminatory intent." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997). There is no evidence of any explicit acknowledgment, but Durkin attempts nonetheless to proceed under the direct method.

She offers evidence that she complained to her homeroom instructor, other instructors, Assistant Deputy Superintendent Roberts, Deputy Superintendent Clark, and Superintendent Hillard, and that Roberts and Lt. Christian "expressed their displeasure with [her] complaints and her suggestions to modify the training procedure," and that she was fired. Pl. Resp. at 12. This falls short of "direct evidence," however. "[M]ere temporal proximity" between the complaint and termination is "rarely sufficient in and of itself to create a triable issue." *Stone*, 281 F.3d at 644. Nor may she rely on the merely asserted expressions of displeasure by Christian and Roberts. *See Fyfe*, 241 F.3d at 602 (Direct evidence must be contemporaneous with or causally related to termination.).

In the absence of direct evidence of retaliation, Durkin must again proceed under the familiar *McDonnell Douglas* burden-shifting method. *Stone*, 281 F.3d at 643. The Seventh Circuit recently

14

clarified that, although evidence of a causal link between the protected activity and the adverse employment action is necessary under the direct method, a plaintiff proceeding under *McDonnell Douglas* "need not show even an attenuated causal link." *Id.* at 644. Instead, a plaintiff must make out a *prima facie* case of retaliation by showing "that (1) after lodging a complaint about discrimination, (2) only [s]he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) [s]he was performing [her] job in a satisfactory manner." *Id.* at 642. The burden then shifts to the employer to demonstrate a non-discriminatory reason for the adverse employment action, which the plaintiff may rebut with evidence that this reason is a pretext for retaliation. *See id.*

It is undisputed that Durkin was terminated, but the City challenges the remaining elements of the *prima facie* case. The burden to show these elements, including the existence of similarly situated employees who did not complain, is on Durkin. *See Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998). She must show that other recruits *who did not engage in protected activity*, but were otherwise similarly situated, were treated more favorably than she. *See Patterson*, 281 F.3d at 680. In the context of retaliation, it does not matter whether it is men or women to whom she compares her situation, but only whether any of them

15

complained. Durkin argues that she has met her burden because there were no other males who were similarly situated in the sense that they failed the firearm qualification, but the relevant question is whether there are any recruits of either gender who did not complain and failed, but were nevertheless retained. Durkin comes forward with no evidence in this regard. *See Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) ("Absent direct evidence of retaliation, failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim.").

## VI. Sexual Harassment

To establish a *prima facie* case of hostile environment sexual harassment, a plaintiff must demonstrate that: "(1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on [the individual's] sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002). For the purposes of this motion, the City does not directly challenge Durkin's ability to meet the first three elements, and argues only that she cannot establish a basis for employer liability.

16

Employer liability "for hostile environment sexual harassment hinges on whether the harasser is the victim's supervisor or merely a co-employee." *Hall*, 276 F.3d at 355. An employer is vicariously liable for harassment by "a supervisor with immediate (or successively higher) authority over the employee." *Id.* The City argues that none of Durkin's alleged harassers were supervisors. There is no question that Peck and Pappas, as Chicago Police Officers and instructors at the Academy, outranked Durkin in the chain of command. *See* Def's Ex. U at 41-42. Durkin also claims that her group leader, Dennis Lopez, was a supervisor because he was a surrogate homeroom instructor with authority over the rest of the class. Pl. Ex. W at 4. But to be a "supervisor" for the purposes of Title VII, an employee must have:

> the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer.

*Hall*, 276 F.3d at 355 (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998)).

There is no evidence that Pappas, Peck or Lopez had any authority to hire, fire, demote, promote, or transfer Durkin. Nor is there evidence that Lopez, although vested with some authority as a group leader, had any actual authority to discipline her or otherwise to affect the conditions of her employment. The mere "fact that an employer authorizes one employee to oversee another

17

employee's job performance does not establish a Title VII supervisory relationship." *Hall*, 276 F.3d at 355. However, there is some evidence that Pappas and Peck, as her instructors, had the authority to discipline her. Durkin testified that Peck made her stand in a yellow box and wait to be recognized as punishment. *See, e.g.*, Pl. Ex. A at 304-05. Durkin also said that Peck made her do pushups before shooting, but she admitted that it was not punishment. Pl. Ex. A at 240, 607. At the Academy, recruits were supposed to make any complaints about instructors to their homeroom instructor, who is above the instructor in the chain of command. Pl. Ex. U at 42. The Seventh Circuit has repeatedly held that this kind of "marginal discretion" is insufficient to impute vicarious liability to an employer. *See Hall*, 276 F.3d at 355 (citing cases). Where, as here, an employee reports to several other more senior employees, *Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000); *Parkins*, 163 F.3d at 1034, and lodges complaints over the supervising employee's head to more senior supervisors, that supervising employee is merely a "low-level supervisor," *Johnson*, 218 F.3d at 730, whose actions will not subject the employer to vicarious liability. *See Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 697 n.4 (7th Cir. 2001).

Durkin argues that Peck and Pappas had the ability to change the terms and conditions of her employment because they "so severely affected her work environment that they repeatedly

18

prevented her from passing the firearms test." Pl. Resp. at 18.

Presumably she means that they intimidated her and harassed her

prior to her qualification attempts, *see* Pl. Resp. to Def's 56.1

Stmt. ¶¶ 63, 107, but there is no evidence that either actually

administered the tests or had any authority to determine whether

she passed or failed. The Supreme Court has noted that:

> [w]hen a fellow employee harasses, the victim can walk away or
> tell the offender where to go, but it may be difficult to
> offer such responses to a supervisor, whose 'power to
> supervise--[which may be] to hire and fire, and to set work
> schedules and pay rates--does not disappear . . . when he
> chooses to harass through insults and offensive gestures
> rather than directly with threats of firing or promises of
> promotion.'

*Faragher v. City of Boca Raton*, 524 U.S. 775, 803 (1998). Durkin

was not in a position to walk away from Peck or Pappas because they

were her superiors. But Peck and Pappas did not wield power over

the conditions of her employment, in the sense of the power to

hire, fire, pass, or fail her, even if they had the ability to

affect her working environment. In this regard, they had no more

power over her than her fellow recruits. The mere authority to

instruct and oversee another employee's job performance is not

enough to establish a supervisory relationship for the purposes of

Title VII. *See Hall*, 276 F.3d at 355. Because none of Durkin's

alleged harassers were supervisors for the purposes of Title VII,

the affirmative defenses set forth in *Burlington Indus., Inc. v.*

*Ellerth*, 524 U.S. 742 (1998), and *Faragher*, 524 U.S. 775, do not

apply. *See Mason v. Southern Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000).

To establish liability for the actions of co-workers, a plaintiff must demonstrate that the City was "negligent either in discovering or remedying the harassment." *Hall*, 276 F.3d at 356. The critical question is whether the employer had notice of the harassment. *Id.* Notice may be inferred where the harassment is pervasive, *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997), but Durkin does not produce evidence of pervasive harassment, so I consider whether the City had actual notice from Durkin's complaints. The City argues that Durkin is "vague" about the parties to whom she complained. In general, she states that she complained "to anybody who would listen" about Peck's teaching methods and verbal abuse. Pl. Ex. A at 178. However, there are only three identifiable complaints that could reasonably be construed as complaints about sexual harassment. On September 9, 1999, after Durkin had failed the firearm qualification test for the fourth time, she met with Deputy Superintendent Clark and complained about Peck's comments on August 23 or 24, 1999, that she had "pulled out [her] witch bag" and that she had told "[her] husband that [she] won't fuck with [him] unless [he] go[es] and talk[s] to Officer Peck." *See* Def's Ex. G-3. That day, Clark opened Complaint Register #256475 to investigate Durkin's complaint. *Id.* Clark also arranged for Durkin's training in Mattoon and her fifth chance to qualify.

The Internal Affairs Division of the CPD opened an investigation and confirmed the allegations with Durkin, but when she was contacted to give a formal statement, she declined on advice of counsel because her termination was pending.[3] The charges were dropped as "not sustained" because there was insufficient evidence to prove or disprove the allegations. Def. Ex. I-3. Durkin argues that the investigation was a sham because no witnesses were interviewed, but she admits that she refused to give a formal statement during the investigation.

The City does not argue here that the acts about which Durkin complained to Clark were not sexual harassment, or that it failed to discover the alleged harassment when Durkin complained to Clark, so the only question is whether it was negligent in remedying it. A plaintiff does not "have a legal duty to cooperate with the employer's investigation; but the reasonableness of the employer's attempts to rectify harassment is measured against how much it knows or should have known." *Perry v. Harris Chernin, Inc.*, 123 F.3d 1030, 1014-15 (7th Cir. 1997). The City had a sexual harassment policy, and there is no evidence that it was not

---

[3] Durkin objects to this evidence as "wholly irrelevant" because the *Faragher* and *Ellerth* affirmative defenses do not apply, but it is relevant to the reasonableness of the City's response, and she does not deny the factual allegations in Def's 56.1 Stmt. of Facts in accord with the Local Rules. *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (holding that legal arguments and general denials without citation to evidence in record are insufficient to create issue of fact).

routinely followed. It is undisputed that, in response to Durkin's complaint to Clark, the City opened an investigation, verified the allegations, which Peck denied, and that Durkin declined to give any further statements. Def. Ex. I-3. As a matter of law that it is not unreasonable for an employer to drop its investigation on the grounds that the allegations could not be supported because the plaintiff failed to make a statement. *See Perry*, 123 F.3d at 1014-15. No reasonable jury could find that the failure of the investigation in this case was attributable to negligence of the City.

The second complaint is Durkin's husband's letter to Superintendent Hillard on September 8, 1999, in which he complained about her poor training, Peck's verbal abuses and neglectful training, and Pappas' kick. However, none of the complaints, on their face, sound in sexual harassment: Durkin's husband did not advert to sexual harassment or discrimination, he did not mention any incidents that were overtly sexual, or even sexually suggestive, and he did not offer any basis for believing that, to the extent that Durkin had been singled out for bad treatment, that it was on the basis of her sex. A jury could not reasonably believe that this letter put Hillard on notice of sexual harassment. *See Parkins*, 163 F.3d at 1035 ("[A] plaintiff 'cannot withstand summary judgment without presenting evidence that she gave the employer

enough information to make a reasonable employer think there was some probability that she was being sexually harassed.'").

The third complaint came after PPO Dolan exposed himself to Durkin. Durkin reported the incident to an African American female sergeant, whom she could not identify by name, but who taught the class in which the incident occurred. Pl. Ex. A at 281-82. The City argues that this is too vague to amount to proper notice. In determining whether an employer had notice of harassment, I consider "whether the employer has designated a channel for complaints of harassment" by setting up a "point person" to receive complaints. *Parkins*, 163 F.3d at 1035. The City does not argue that it had any designated particular "point person," but the CPD's sexual harassment policy directs department members to report incidents of sexual harassment to "their immediate supervisor," unless that person was the harasser, and then the complaint should be lodged one rank above the alleged harasser. Def. Ex. A-11. Durkin complained to her course instructor, who was her immediate superior. Pl. Ex. U at 42. The City does not point to any requirement that Durkin identify that individual by name; Durkin identified her by gender, race, rank, and by the course she was teaching; this should be sufficient for the City to identify her. There is no evidence that the City ever followed through on this complaint, so a jury could conclude that the City was negligent. *See Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d

23

1007, 1012 (7th Cir. 1994) (employer not entitled to judgment as a matter of law where its "efforts at investigation were lackluster, its disciplinary efforts nonexistent, its remedial efforts perfunctory").

Nevertheless, Durkin cannot prevail at trial based on this isolated incident. Whether an environment is "hostile" or "abusive" in violation of Title VII depends on the totality of the circumstances, which include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Generally, "isolated and minor incidents of questionable conduct . . . will not warrant a conclusion of sexual harassment." *Hilt-Dyson*, 282 F.3d at 463. "'[O]ccasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers' generally does not create a work environment that a reasonable person would find intolerable." *Id.* Here, the incident with Dolan, taken in the light most favorable to Durkin, involved the following conduct: while Durkin was in the back seat of a police car on the driving range, Dolan stepped out of the car to urinate. He unzipped his pants, took out his penis, urinated, then zipped up his pants. While he was urinating, he said to Durkin "suck this" and laughed. Pl. Ex. A at

278-83. That was the only time that anyone at the Academy exposed himmself to Durkin. *Id.* at 284-85.

Although single incidents of harassment may be sufficient to create a hostile environment, they generally involve threatening physical contact. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809 (7th Cir. 2000) (fellow employee not only forcibly kissed plaintiff but later cornered plaintiff and attempted to remove her brassiere); *Smith v. Sheahan*, 189 F.3d 529, 532 (7th Cir. 1999) (fellow employee physically assaulted plaintiff and had history of verbally abusing female co-workers). This was an isolated incident that was not physically threatening because Durkin was separated from Dolan by a car door, and while Dolan's behavior was vulgar and boorish, it was not particularly severe. A single incident of indecent exposure that does not constitute a sexual assault is generally insufficiently severe to constitute sexual harassment. *See Jones v. Clinton*, 990 F. Supp. 657, 675-76 (E.D. Ark. 1998) (single incident not severe enough to constitute sexual harassment where alleged harasser grabbed plaintiff, pulled her close to him, put hand on her leg, and attempted to kiss her, then exposed erect penis and asked plaintiff to "kiss it"). Although the City did not move for summary judgment on this basis, Durkin would not be entitled to judgment on this claim even on her version of the

facts, so I GRANT the motion for summary judgment on all counts. The City's motion to bar is therefore DENIED AS MOOT.

ENTER ORDER:

*Elaine E Bucklo*

**Elaine E. Bucklo**
United States District Judge

Dated:　April 26, 2002